**HAGENS BERMAN SOBOL SHAPIRO LLP**
Lucas E. Gilmore (Bar No. 250893)
715 Hearst Avenue, Suite 300
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
lucasg@hbsslaw.com

*Liaison Counsel for Plaintiff*

**LABATON KELLER SUCHAROW LLP**
Francis P. McConville (*pro hac vice* forthcoming*)*
Connor C. Boehme (*pro hac vice* forthcoming*)*
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
fmcconville@labaton.com
cboehme@labaton.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| WAYNE COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>APPLOVIN CORPORATION, ADAM FOROUGHI, HERALD CHEN, and MATTHEW STUMPF,<br><br>Defendants. | Case No.<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>**DEMAND FOR JURY TRIAL** |

1.      The Wayne County Employees' Retirement System ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' (as defined herein) public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding AppLovin Corporation ("AppLovin" or the "Company"), analysts' reports, and information readily obtainable on the Internet.  Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

2.      This is a class action brought on behalf of a "Class" of all persons or entities who purchased or otherwise acquired AppLovin securities between May 10, 2023 and March 26, 2025, inclusive (the "Class Period").  Plaintiff brings this action seeking to recover damages caused by Defendants' violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

3.      AppLovin is a Palo Alto, California-based technology company that helps developers to market, monetize, analyze, and publish their mobile apps through the Company's digital advertising, marketing, and analytics platforms.  AppLovin relies on third-party platforms like the Apple App Store and Google Play Store to distribute its developers' apps, collect payments made on in-app purchases, and target users with relevant advertising.  In mid-2020, Google, Apple, and Meta Platforms initiated a multi-year global effort to restrict third-party tracking activity and limit advertisers' ability to collect app and user data across platforms and devices.  As a significant driver of AppLovin's revenue, these third-party platforms have considerable market power and discretion to set platform fees, select which apps to promote, and decide how much consumer information to provide to advertising networks.

4.      Throughout the Class Period, AppLovin assured investors that the third-party platforms' implementation of increased privacy controls "has not had a significant impact on our

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1  overall business" and that Google and Apple's data privacy changes "have had a relatively muted

2  aggregate impact on our overall results of operations."  AppLovin also attributed its use of artificial

3  intelligence ("AI") as a key driver of revenue growth and a strategic differentiator in its advertising

4  business.

5      5.      This complaint alleges that, during the Class Period, Defendants misled investors by:

6  (1) failing to disclose that AppLovin's revenue and profit growth were unsustainable because of the

7  Company's systematic exploitation of fraudulent advertising practices, including click spoofing and

8  the use of a backdoor installation scheme to force unwanted apps on customers; (2) disclosing risks

9  related to AppLovin's breach of terms of service with third-party platforms that were materially false

10 and misleading because they characterized adverse facts that had already materialized as mere

11 possibilities; (3) falsely attributing AppLovin's growth in revenue to the Company's enhanced AXON

12 2.0 digital ad platform and the use of "cutting-edge AI technologies" to more efficiently match

13 advertisements to mobile games; and (4) as a result of the foregoing, making public statements about

14 the Company's business, operations, and prospects that were materially false and misleading.

15     6.      On February 26, 2025, investors began to learn the truth about AppLovin's fraudulent

16 business practices when Culper Research and Fuzzy Panda Research published reports (the "Culper

17 Report" and "Panda Report") alleging several issues with AppLovin's practices.  The Culper Report

18 alleged that AppLovin exploits app permissions to force-feed silent, backdoor app installations onto

19 users' phones, often through inadvertent clicks due to poor user experience design.  The Culper Report

20 also stated that AppLovin's e-commerce program is a "smoke and mirrors game" that steals

21 attribution for advertising from Meta to bolster its results.  The Panda Report accused AppLovin of

22 reverse-engineering Meta Platforms' advertising data to target users and commit advertising fraud.

23 The report highlighted "impossibly high CTRs (click-through rates)" of 30 percent to 40 percent,

24 which are ten times the industry norms, attributing this to manipulative practices such as ads clicking

25 on themselves or using design gimmicks to trigger forced shadow downloads.  The Panda Report also

26 alleged that AppLovin illegally tracks children's data and serves sex ads to minors.

27     7.      After the Culper Report and Panda Report were published, AppLovin's stock price fell

28 by 12.2 percent, dropping from $377.06 to $331.00 per share on February 26, 2025.

8.      Then, on March 26, 2025, Muddy Waters Research published a report (the "Muddy Waters Report") concluding that AppLovin systematically used proprietary third-party data in ways that violated the terms of service of Facebook, Google, Snap, Reddit, as well as other platforms, potentially leading to backlash and service blocking and threatening the sustainability of AppLovin's revenue growth.

9.      On this news, AppLovin's stock price plummeted 20.1 percent, dropping from $327.62 to $261.70 per share on March 27, 2025.

10.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and Class members have suffered significant losses and damages.

## JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

11.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) as the alleged misstatements and the subsequent damages took place in this judicial district and AppLovin is headquartered in this Judicial District.  The intra-district assignment to the San Jose division of the Court is proper under Local Rule 3-2(e) because a substantial number of the events or omissions giving rise to the claims arose in Santa Clara County, where AppLovin is headquartered and the Defendants conduct business.

14.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

15.    Plaintiff, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased AppLovin securities during the Class Period and was damaged as the result of Defendants' wrongdoing alleged in this complaint.

16.    Defendant Adam Foroughi ("Foroughi") was the Company's Chief Executive Officer ("CEO") at all relevant times.

17.    Defendant Herald Chen ("Chen") Herald Chen was the Company's Chief Financial Officer ("CFO") from November 2019 until his resignation, effective December 31, 2023.

18.    Defendant Matthew Stumpf ("Stumpf") has been the Company's CFO since January 1, 2024.

19.    Defendants Foroughi, Chen, and Stumpf are collectively referred to herein as the "Individual Defendants."

20.    The Individual Defendants possessed the power and authority to control the contents of AppLovin's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of AppLovin's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions within AppLovin, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

21.    The Company and the Individual Defendants are sometimes collectively, in whole or in part, referred to herein as the "Defendants."

**SUBSTANTIVE ALLEGATIONS**

**Background**

22.    AppLovin is a mobile gaming and advertising technology company.  The Company's major customers include a diverse range of advertisers, independent developer studios, large global internet platforms like Google and Facebook, and other companies involved in mobile gaming and e-

commerce markets.  AppLovin has faced several challenges and made strategic adjustments in response to tightening privacy restrictions by platforms like Google Play Store and Apple Store. These changes reduced the availability and utility of data, potentially making their use in targeted advertising less effective for customers.

23.     AppLovin generates revenue primarily through two segments: (1) Advertising Revenue, for which the Company earns fees from advertisers for placing ads on mobile applications owned by publishers; and (2) Apps Revenue, including revenue from in-app purchases and from clients purchasing digital advertising inventory within AppLovin's portfolio of apps.  The Company's mobile  gaming apps are generally free to play, and  AppLovin  generates revenue from  in-app purchases made by users.  The Company's software platforms are composed of a suite of services sold to other mobile app advertisers to purportedly grow and monetize their respective apps.

24.     In the second quarter of 2024, the Company rolled out its e-commerce pilot program, which was  designed to expand the Company's advertising capabilities beyond its core gaming vertical.  AppLovin's e-commerce pilot program enables commercial vendors that sell products via websites to buy video ad inventory within mobile gaming and other apps.  Users are then routed to the vendors' websites to complete their purchases.

25.     AppLovin markets its AXON algorithm as a sophisticated AI-powered advertising engine designed to optimize user acquisition, ad targeting, and monetization for advertisers and publishers.  AXON is a machine learning platform that purports to continuously improve its models by assessing vast amounts of data generated from AppLovin's network of over a billion daily active users.  This data forms a feedback loop where ad impressions, user interactions, and conversion metrics are processed by AI to predict user behavior and identify high-value audiences.

**Materially False and Misleading Statements Issued During the Class Period**

26.     The Class Period begins on May 10, 2023, the day after AppLovin issued a shareholder letter in connection with the filing of its financial results for the first quarter and fiscal year ended March 31, 2023 (the "Q1 2023 Shareholder Letter").  In the Q1 2023 Shareholder Letter, AppLovin stated that "***Our solid financial performance in the first quarter was driven by our market leading solutions which led to record quarterly Software Platform revenue of $355 million, an increase of***

*16% over the prior quarter*."  The Q1 2023 Shareholder Letter attributed the increase in revenue in part to improvements in its core advertising technology:

> In the first quarter, we achieved our highest quarterly Software Platform revenue at $355 million, growing 199% year-over-year (8% growth after excluding the impact of publisher bonuses in the prior year period). ***The 8% increase in revenue was primarily driven by partial stabilization in the mobile app ad market and continued improvements in our core advertising technology resulting in higher revenue per install from our advertising solutions***, and a modest contribution from our acquisition of Wurl.

27.     On the next day, AppLovin filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the first quarter ended March 31, 2023 (the "Q1 2023 10-Q").   The Q1 2023 10-Q assured investors that the third-party platforms' implementation of increased privacy controls "has not had a significant impact on our overall business" and that Google and Apple's data privacy changes "have had a relatively muted aggregate impact on our overall results of operations."

28.     The Q1 2023 10-Q also contained the following risk factor concerning the Company's reliance on third-party platforms:

> ***We rely on third-party platforms to distribute our Apps and collect revenue, and if our ability to do so is harmed, or such third-party platforms change their policies in such a way that restricts our business, increases our expenses, or limits the information we derive from our Apps, our business, financial condition, and results of operations could be adversely affected***.
>
> The mobile app ecosystem depends in part on a relatively small number of third-party distribution platforms, such as the Apple App Store, the Google Play Store, and Facebook, some of which are direct competitors. We derive significant revenue from the distribution of our Apps through these third-party platforms and almost all of our IAPs are made through the payment processing systems of these third-party platforms. We are subject to the standard policies and terms of service of such third-party platforms, which generally govern the promotion, distribution, content, and operation of applications on such platforms.

This risk factor was false or misleading because AppLovin's systematic violation of terms of service with Apple, Google, and Meta Platforms was already making the Company's revenue unsustainable. Therefore, this very risk had materialized during the Class Period.

29.     During the corresponding earnings call held that same day, Defendant Foroughi detailed the improvements made to the AXON platform and the development of AXON 2.0:

Upgrading from AXON 1 to 2 is no different than OpenAI moving from ChatGPT 3 to 4. Our models can always be improved, and our entire business is powered by the evolution of our technology. ***The enhancements to our machine learning and AI are not a onetime thing, but a series of upgrades over time. As we make these, there is the potential for significant lifts to both revenue and cash flow. We are currently in the midst of a staged rollout of AXON 2, and we are very excited about the long-term potential of this new technology for our partners and our business.***

30.    On August 9, 2023, the Company published a shareholder letter announcing the Company's financial results for the second quarter ended June 30, 2023 (the "Q2 2023 Shareholder Letter").    Specifically, the Q2 2023 Shareholder Letter stated the following, in relevant part:

We had a strong second quarter, exceeding the high end of our revenue, Adjusted EBITDA and margin guidance. ***Outperformance was driven primarily by the successful roll-out of our latest AI- based advertising engine, AXON 2.0 which powers our AppDiscovery platform***. The Software Platform business achieved record revenue, increasing a solid 14% from last quarter to $406 million, and record Adjusted EBITDA, increasing 25% from last quarter to $273 million, yielding a 67% Adjusted EBITDA margin and generating over 80% of total Adjusted EBITDA. Additionally, our Apps business continued to deliver stable Adjusted EBITDA during the quarter of $61 million with a healthy 18% Adjusted EBITDA margin.

31.    On August 9, 2023, the Company submitted its quarterly report for the period ended June 30, 2023 on a Form 10-Q filed with the SEC (the "Q2 2023 10-Q"). The Q2 2023 10-Q assured investors that the third-party platforms' implementation of increased privacy controls "has not had a significant impact on our overall business" and that Google and Apple's data privacy changes "have had a relatively muted aggregate impact on our overall results of operations."

32.    The Q2 2023 10-Q contained substantially the same risk factor concerning the Company's reliance on third-party platforms, *supra*. This risk factor was false or misleading because AppLovin's systematic violation of terms of service with Apple, Google, and Meta Platforms was already making the Company's revenue unsustainable. Therefore, this very risk had materialized during the Class Period.

33.    On November 8, 2023, the Company published a shareholder letter announcing the Company's financial results for the third quarter ended September 30, 2023 (the "Q3 2023

Shareholder Letter").  Specifically,  the Q3 2023 Shareholder Letter stated the following, in relevant part:

> We are thrilled to announce another quarter of solid execution leading to very strong financial results. We exceeded the high-end of our quarterly guidance thanks to our incredible team and unwavering commitment to growing the mobile app ecosystem. ***Our success this quarter was primarily driven by the continued performance of AXON 2.0, the AI-based advertising engine behind our AppDiscovery platform***. Total revenue for the third quarter was $864 million (+21% yr/ yr), net income was $109 million at a net margin of 13%, and Adjusted EBITDA was $419 million (+63% yr/yr) at an Adjusted EBITDA margin of 49%. During the quarter, we generated $199 million of net cash from operating activities and $194 million of Free Cash Flow. At the end of the third quarter, we had $332 million of cash and cash equivalents.
>
> […]
>
> ***During the quarter we benefited from the full quarter impact of our initial AXON 2.0 launch, continued improvements of our technology and an increase in advertiser spend as our clients saw the improved performance of our new AI- enhanced advertising engine.*** Software Platform Adjusted EBITDA grew 91% year-over-year to $364 million at an Adjusted EBITDA margin of 72%.

34.     On November 8,  2023, the Company submitted its quarterly report for the period ended September 30, 2023 on a Form 10-Q filed with the SEC (the "Q3 2023 10-Q").  The Q3 2023 10-Q assured investors that the third-party platforms' implementation of increased privacy controls "has not had a significant impact on our overall business" and that Google and Apple's data privacy changes "have had a relatively muted aggregate impact on our overall results of operations."

35.     The Q3 2023 10-Q contained substantially the same risk factor concerning the Company's reliance on third-party platforms, *supra*.  This risk factor was false or misleading because AppLovin's systematic violation of terms of service with Apple, Google, and Meta Platforms was already making the Company's revenue unsustainable.  Therefore, this very risk had materialized during the Class Period.

36.     On February 14, 2024, the Company published a shareholder letter announcing the Company's financial results for the fourth quarter and full year ended December 31, 2023 (the "Q4 2024 Shareholder Letter").   Specifically,  the Q4 2024 Shareholder Letter stated the following, in relevant part:

In 2023 we released our advanced AXON 2.0 technology, optimized our gaming studios, and invested in new initiatives to drive future market expansion and long- term growth. ***In 4Q23 there were several key factors driving the growth of our customers and partners including a strong holiday season, year-over-year growth in the mobile app advertising market, our MAX bidding enhancements and the market shift to real-time bidding***. The combination of these factors is helping the market improve advertising efficiency, which we believe will lead to continued compounding growth for our partners.

[…]

In the fourth quarter, we achieved another record quarter with Software Platform revenue of $576 million, growing 88% year-over-year and 14% from the third quarter. ***The growth was driven by the continued performance of AppDiscovery, as the AXON engine continues to learn and scale***.

37.     On February 26, 2024, the Company submitted its annual report for the fourth quarter and full year ended December 31, 2023 on a Form 10-K filed with the SEC (the "2023 10-K"). The 2023 10-K assured investors that the third-party platforms' implementation of increased privacy controls "has not had a significant impact on our overall business" and that Google and Apple's data privacy changes "have had a relatively muted aggregate impact on our overall results of operations."

38.     The 2023 10-K contained substantially the same risk factor concerning the Company's reliance on third-party platforms, *supra*. This risk factor was false or misleading because AppLovin's systematic violation of terms of service with Apple, Google, and Meta Platforms was already making the Company's revenue unsustainable. Therefore, this very risk had materialized during the Class Period.

39.     On May 8, 2024, the Company published a shareholder letter announcing the Company's financial results for the third quarter ended March 31, 2024 (the "Q1 2024 Shareholder Letter"). Specifically, the Q1 2024 Shareholder Letter stated the following, in relevant part:

The first quarter marked a strong start to 2024 with outstanding business performance driven by the continued improvement of our AXON technology. We were encouraged to see improvement in the app advertising market with another quarter of year-over-year market growth and a continued shift to real-time bidding. ***By continuing to innovate and improve our AXON technology, we remain committed to driving growth not just for our company, but for the entire ecosystem we support***.

[…]

1

2

3

> Our Software Platform segment grew significantly in the first quarter with Software Platform revenue of $678 million, up 91% year-over-year **driven by further improvement of our AXON technology, which continues to benefit from ongoing self-learning, additional data, and engineering enhancements.**

4    40.    On May 8, 2024, the Company submitted its quarterly report for the period ended

5    March 31, 2024 on a Form 10-Q filed with the SEC (the "Q1 2024 10-Q").  The Q1 2024 10-Q

6    assured investors that the third-party platforms' implementation of increased privacy controls "has

7    not had a significant impact on our overall business" and that Google and Apple's data privacy

8    changes "have had a relatively muted aggregate impact on our overall results of operations."

9    41.    The Q1 2024 10-Q contained substantially the same risk factor concerning the

10   Company's reliance on third-party platforms, *supra*.  This risk factor was false or misleading because

11   AppLovin's systematic violation of terms of service with Apple, Google, and Meta Platforms was

12   already making the Company's revenue unsustainable.  Therefore, this very risk had materialized

13   during the Class Period.

14   42.    On August 7, 2024, the Company published a shareholder letter announcing the

15   Company's financial results for the second quarter ended June 30, 2024 (the "Q2 2024

16   Shareholder Letter").  Specifically, the Q2 2024 Shareholder Letter stated the following, in relevant

17   part:

18

19

20

21

22

> In the second quarter of 2024, we celebrated the first anniversary of our enhanced AXON technology. Reflecting on the past year, **we're thrilled by the significant growth AXON drove for our advertising partners. AXON enhancements through ongoing self-learning and our dedicated development efforts have fueled robust business performance this quarter.**
> In the second quarter, we generated revenue of $1.08 billion (+44% yr/yr), net income of $310 million (+286% yr/yr) at a net margin of 29%, and Adjusted EBITDA of $601 million (+80% yr/yr) at an Adjusted EBITDA margin of 56%.

23   43.    On August 7, 2024, the Company submitted its quarterly report for the period ended

24   June 30, 2024 on a Form 10-Q filed with the SEC (the "Q2 2024 10-Q").  The Q2 2024 10-Q assured

25   investors that the third-party platforms' implementation of increased privacy controls "has not had a

26   significant impact on our overall business" and that Google and Apple's data privacy changes "have

27   had a relatively muted aggregate impact on our overall results of operations."

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

44.    The Q2 2024 10-Q contained substantially the same risk factor concerning the Company's reliance on third-party platforms, *supra*.  This risk factor was false or misleading because AppLovin's systematic violation of terms of service with Apple, Google, and Meta Platforms was already making the Company's revenue unsustainable.  Therefore, this very risk had materialized during the Class Period.

45.    On November 6, 2024, the Company published a shareholder letter announcing the Company's financial results for the third quarter ended September 30,  2024 (the "Q3 2024 Shareholder Letter").  Specifically,  the Q3 2024 Shareholder Letter stated the following, in relevant part:

> We had another fantastic quarter in Q3. ***Our AXON models continue to improve through self-learning and, more importantly this quarter, from technology enhancements by our engineering team***. As we continue to improve our models our advertising partners are able to successfully spend at a greater scale. We're proud to be a catalyst to reinvigorating growth in our industry.

46.    On November 6, 2024, the Company submitted its quarterly report for the period ended June 30,  2024 on a Form 10-Q filed with the SEC (the "Q2 2024 10-Q").  The Q2 2024 10-Q assured investors that the third-party platforms' implementation of increased privacy controls "has not had a significant impact on our overall business" and that Google and Apple's data privacy changes "have had a relatively muted aggregate impact on our overall results of operations."

47.    The Q2 2024 10-Q contained substantially the same risk factor concerning the Company's reliance on third-party platforms, *supra*.  This risk factor was false or misleading because AppLovin's systematic violation of terms of service with Apple, Google, and Meta Platforms was already making the Company's revenue unsustainable.  Therefore, this very risk had materialized during the Class Period.

48.    On February 12, 2025, the Company issued a press release announcing its financial results for the fourth quarter and full year ended December 31, 2024.  During the accompanying conference call to discuss the results, Defendant Foroughi touted the use of AppLovin's AI technology to drive revenue:

> ***Q4 was a major milestone, arguably our most foundational period since the AXON upgrade in 2023. For the first time, we captured meaningful holiday***

*shopping advertising dollars and witnessed the impact of an advertising category beyond solely gaming contributing to our growth.* [...] Seven years ago, we began acquiring gaming studios to help train our earliest machine learning models, an invaluable step in *shaping the AI that underpins our AXON platform*.

49.    The statements referenced in ¶¶ 26-48 were materially false and misleading because Defendants: (1) failed to disclose that AppLovin's revenue and profit growth were unsustainable because of the Company's systematic exploitation of fraudulent advertising practices, including click spoofing and the use of a backdoor installation scheme to force unwanted apps on customers; (2) disclosed risks related to AppLovin's breach of terms of service with third-party platforms that were materially false and misleading because they characterized adverse facts that had already materialized as mere possibilities; (3) falsely attributed AppLovin's growth in revenue to the Company's enhanced AXON 2.0 digital ad platform and the use of "cutting-edge AI technologies" to more efficiently match advertisements to mobile games; and (4) as a result of the foregoing, made public statements about the Company's business, operations, and prospects that were materially false and misleading.

## THE TRUTH BEGINS TO EMERGE

## WHILE APPLOVIN CONTINUES TO MISLEAD INVESTORS

50.    On February 26, 2025, investors began to learn the truth when Culper Research published a report entitled "AppLovin Corporation (NADSAQ:APP): Force-Feeding Users with Silent Backdoor Installs and Copying Meta's Homework." The Culper Report alleged, among other things, that "AppLovin's nascent e-commerce initiative is a smoke and mirrors game that the Company has rigged" by "requir[ing] advertisers first demonstrate proof of $600,000 per month on Meta, so that AppLovin – through its MAX mediation platform – can 'see' ads shown to Meta users in order to insert itself into the process and take credit for the sale." The Culper Report further alleged that AppLovin's App segment is dependent on the "systematic exploitation of app permissions that enable advertisements themselves to force-feed silent, backdoor app installations directly onto users' phones" to "illicitly inflate the Company's mobile gaming result." The Culper Report concluded that

because the Company's "gaming promotion is unsustainable, and the Company has thus hung its hat on e-commerce" where it operates a similarly "rigged" operation.

51.    The Culper Report, as quoted above, specifically stated, in relevant part, the following regarding AppLovin's "rigged" app and advertising practices:

> Having peaked at a market capitalization of $173 billion, we believe AppLovin could go down as the single largest US stock promotion unraveling since at least the GFC. We are short for two reasons.

> First, we believe AppLovin's recent success in mobile gaming stems from the systematic exploitation of app permissions that enable advertisements themselves to force-feed silent, backdoor app installations directly onto users' phones, with just a single click – an event that is often inadvertent thanks to the Company's notorious UX gimmicks. This is AdTech's version of "the truck rolling down the hill." As AppLovin is paid largely on a per-install basis, each illicit install translates directly to profit.

> Second, we believe AppLovin's nascent e-commerce initiative is a smoke and mirrors game that the Company has rigged in its favor from the start. AppLovin must maintain a tight rein on advertisers it allows onto the platform, lest the narrative slip. To that end, the Company requires advertisers first demonstrate proof of $600,000 per month on Meta, so that AppLovin – through its MAX mediation platform – can "see" ads shown to Meta users in order to insert itself into the process and take credit for the sale. AppLovin then cajoles advertisers into spreading the news of their success, drumming up excitement.

52.    Also on February 26, 2025, Fuzzy Panda Research published the Panda Report entitled "AppLovin (APP) – Formers Allege Ad Fraud; Is DTC Hype Actually 'Stealing' Meta's Data." The Panda Report detailed the manner in which AppLovin's e-commerce pilot program operates its rigged operation by "reverse engineer[ing] Meta's targeting methods" in order to "steal" referral credits for targeting advertisers. The Panda Report further detailed the manner in which the Company's "impossibly high CTRs (click-thru rates) of 30-40%, 10x the industry norms" are the product of what industry experts can only describe as "Ad Fraud." The Panda Report also detailed the manner in which that Company inflates key metrics, and monetizes "fake activity" including using "ads which are programmed to 'click themselves' and open the App Store." Specifically, the Panda Report stated the following, in relevant part:

**Experts Explain How AppLovin Could "Steal" Meta's Data**

13

Multiple AdTech experts said they think the reason AppLovin's e-com ads produce ROAS similar to Meta's is likely rooted in AppLovin having found a creative solution for how to harness and piggyback on Meta's user PII and rich targeting data.

"They're taking a bunch of different data points that Meta sends in different contexts. And then if you combine them together, it creates a persistent identifier." ~Ad Executive D

Experts first explained that Meta does not need AppLovin. Second, they told us that these incremental ad dollars to AppLovin are essentially directly coming from Meta's bottom-line. Which is the exact opposite to what Adam Foroughi told investors in the Q4-2024 earnings call.

[…]

**Formers Allege Ad-Fraud – APP Caught Using Fake Clicks & Other Dirty Tricks To 'Game' Installs**

- Shady Ad Practices

- Clickjacking & Click Spoofing? = Monetization of Mistaps? Deliberate False

- Engagement?

- Code Reveals AppLovin Counting FAKE Clicks & Downloads

"Everybody in the industry knows that AppLovin is full of sh*t and that it's fraudulent." ~Former AppLovin Anti-Fraud Executive B

We interviewed a multitude of industry and ad fraud experts who consistently told us that AppLovin is deeply engaged in "Ad Fraud." We experienced AppLovin's shady ad practices first-hand. We played the games, we analyzed the data APP collected from us, and we discovered a multitude of dark business practices ad fraud experts told us is "100% fraud."

53.     On this news, the Company's share price fell $46.06, or 12.2 percent, to close at $331.00 per share on February 26, 2025, on unusually heavy trading volume.

54.     Despite these revelations, AppLovin continued to issue misleading statements regarding AppLovin's backdoor installation scheme.  On February 26, 2025, Defendant Foroughi published a blog post titled "A Note from Our CEO" that addressed the allegations in both reports:

I'm writing this mid-quarter update to address the recent short reports published about our company. It's disappointing that a few nefarious short-sellers are making false and misleading claims aimed at undermining our success, and driving down our stock price for their own financial gain, rather than acknowledging the sophisticated AI models our team has built to enhance advertising for our partners.

14

While the reports are littered with inaccuracies and false assertions, and we won't comment on every point, it's important to correct the record around a few foundational issues:

Compliance and Integrity:

Our platform is subject to App Store policies. ***All of the games we promote are also apps published in the App Store, therefore, they all have to comply with App Store policies. Our business is based on transparency and integrity***. Our partners spend billions annually because we drive real, incremental value in the form of revenue directly attributable to advertising dollars spent—***proving that our business model is both legitimate and profitable for partners***.

Consumer Experience:

We earn revenue based on the value we drive—not on clicks or mere impressions. Our advertisements are designed to generate real engagement and revenue for our advertisers. Every download results from an explicit user choice—whether via the App Store or our Direct Download experience. Our economic model demands that ads lead to genuine, high-intent engagement, ensuring our campaigns deliver meaningful, measurable results. ***As part of our platform enforcement efforts, we deploy overlapping policy requirements and technical measures to help ensure the quality of the ads served through our platform***.

Data Practices:

***We do not track children's data***. Our terms and policies explicitly prohibit apps exclusively designed for and/or exclusively directed to children, partners from providing us with children's data, and partners from initializing our SDK in connection with children's data. Additionally, we obtain data from our partners solely in the context of providing them with advertising services; we do not work separately with data brokers. Adjust and MAX operations are entirely independent and transparent, with no conflicts or house bias. ***We run a fair mediation process that can be contractually audited by our partners, ensuring that all data accessed by us is equally available to competing ad networks. We also do not have any means or desire to look at other company's bid or user data***; our models use solely behavioral data, ad engagement data, win/loss notifications from mediation (same data shared to any bidder on our platform), and advertiser data to generate predictions.

Financial Transparency:

***The claims of financial and accounting improprieties are factually incorrect and have no basis whatsoever. We do not have any duplication of revenue from related parties***, including our international entities or Apps businesses. We are a public company audited by a Big Four accounting firm and have never received a modified opinion in our history. We report net

revenue with high margins and efficiently drive cash flow. Our low tax burden is due to stock-based compensation deductions and intelligent tax structuring, similar to many tech companies. Our numerous subsidiaries—mainly from our gaming operations—will be simplified following our recently announced sale of the studios.

E-commerce Pilot:

***Our e-commerce pilot is performing exceptionally well***. The current requirement for a minimum monthly media spend is designed to justify the resources needed for manual onboarding. We plan to expand our self-service tools and gradually lift these requirements over the year. To highlight our success, in December, we reached a run rate of roughly $1 billion a year of gross advertiser spend in the e-commerce category alone from around 600 customers. The growth potential in the coming years is substantial. Moreover, ***the speed of this growth clearly demonstrates the legitimacy and effectiveness of our platform***.

It's also noteworthy that the short reports emerged after our earnings report, where we would be in a period of being unable to respond with financial performance. We remain focused on executing our strategy, generating strong cash flow, and conducting share buybacks.

55.    These statements denying the allegations against AppLovin in the Culper Report and the Fuzzy Panda Report were materially false and misleading to investors for the reasons discussed *supra*.

## THE TRUTH IS FULLY REVEALED

56.    The truth about the legitimacy of AppLovin's business was fully revealed on March 26, 2025, when the Muddy Waters Report was published.  The Muddy Waters Report concluded that AppLovin engaged in several questionable practices.  The Muddy Waters Report alleged four main issues.  First, the Muddy Waters Report claimed that over half of AppLovin's ecommerce ads were placed via "retargeting" of content, which suggested that the ads did not provide real value and could violate terms of service of major platforms like Apple, Meta, and Google.  Second, the Muddy Waters Report stated that 23 percent of beta test advertisers had "churned," or been lost to attrition.  Third, the Muddy Waters Report alleged that AppLovin used proprietary third-party data in ways that violated the terms of service of its competitors, potentially leading to backlash and service blocking.  Finally, the Muddy Waters Report alleged that AppLovin claimed that it drives incremental sales, or

1    real users who click the ads and actually buy products, nearly 100 percent of the time, when in truth

2    AppLovin's incrementality rate was only 25 to 35 percent.

3        57.    On this news, AppLovin's stock price plummeted 20 percent, dropping from $327.62

4    to $261.70 per share on March 27, 2025.

5        58.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in

6    the market value of the Company's securities, Plaintiff and other Class members have suffered

7    significant losses and damages.

8                        **CLASS ACTION ALLEGATIONS**

9        59.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

10    of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired AppLovin

11    securities between May 25, 2023 and February 6, 2025, inclusive (the "Class").  Excluded from the

12    Class are Defendants and their families, the officers and directors of AppLovin, members of their

13    immediate families and their legal representatives, heirs, successors or assigns, and any entity in

14    which Defendants have or had a controlling interest.

15        60.    The members of the Class are so numerous that joinder of all members is

16    impracticable.  The disposition of their claims in a class action will provide substantial benefits to the

17    parties and the Court.  Throughout the Class Period, AppLovin's common stock was actively traded

18    on the New York Stock Exchange, one of the largest stock exchanges in the world.  While the exact

19    number of Class members is unknown to Plaintiff at this time and can only be ascertained through

20    appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class.

21    During the Class Period, there were more than 56 million shares of AppLovin common stock

22    outstanding, and the average daily trading volume was over 1.7 million shares.  Record owners and

23    other members of the Class may be identified from records maintained by AppLovin or its transfer

24    agent(s) and may be notified of the pendency of this action using the form of notice similar to that

25    customarily used in securities class actions.

26        61.    There is a well-defined community of interest in the questions of law and fact involved

27    in this case.  Questions of law and fact common to the members of the Class, which predominate over

28    questions which may affect individual Class members, include:

17

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

a.   Whether Defendants violated the Exchange Act;

b.   Whether Defendants omitted and/or misrepresented material facts;

c.   Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d.   Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e.   Whether the price of AppLovin securities were artificially inflated; and

f.   The extent of damage sustained by members of the Class and the appropriate measure of damages.

62.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages as a result of Defendants' wrongful conduct.

63.    Plaintiff will adequately protect the interests of the Class and has retained counsel who is experienced in securities and class action litigation.  Plaintiff has no interests which conflict with those of the Class.

64.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

**APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET**

65.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

a.   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.   the omissions and misrepresentations were material;

c.   the Company's securities traded in an efficient market;

d.   the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

e.   Plaintiff and other members of the Class purchased AppLovin securities between the time Defendants misrepresented or failed to disclose material facts and the time

1           the true facts were disclosed, without knowledge of the misrepresented or omitted

2           facts.

3        66.    At all relevant times, the market for AppLovin securities was efficient for the

4    following reasons, among others:

5        67.    As a result of the foregoing, the market for AppLovin securities promptly digested

6    current information regarding AppLovin from all publicly available sources and reflected such

7    information in the price of AppLovin securities.

8          a.   as a regulated issuer, AppLovin filed periodic public reports with the SEC;

9          b.   AppLovin regularly communicated with public investors via established market

10           communication mechanisms, including through regular disseminations of press

11           releases on the major newswire services and through other wide-ranging public

12           disclosures, such as communications with the financial press, securities analysts,

13           and other similar reporting services;

14         c.    AppLovin was followed by numerous securities analysts employed by major

15           brokerage firms who wrote reports that were distributed to the sales force and

16           certain customers of their respective brokerage firms and that were publicly

17           available and entered the public marketplace; and

18         d.   AppLovin securities were actively traded in an efficient market, including its

19           common stock that was traded on the NASDAQ under the ticker symbol "APP."

20                     **<u>NO SAFE HARBOR</u>**

21       68.    The statutory safe harbor provided for forward-looking statements under certain

22   circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The

23   statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

24   In addition, to the extent certain of the statements alleged to be false may be characterized as forward-

25   looking, they were not identified as "forward-looking statements" when made and there were no

26   meaningful cautionary statements identifying important factors that could cause actual results to differ

27   materially from those in the purportedly forward-looking statements.  In the alternative, to the extent

28   that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein,

1    Defendants are liable for those false forward-looking statements because at the time each of those

2    forward-looking statements were made, the speaker had actual knowledge that the forward-looking

3    statement was materially false or misleading, and/or the forward-looking statement was authorized or

4    approved by an executive officer of AppLovin who knew that the statement was false when made.

5                                    **LOSS CAUSATION**

6            69.    During the Class Period, as detailed herein, AppLovin and the Individual Defendants

7    made materially false and misleading statements and omissions, and engaged in a scheme to deceive

8    the market.  These false and misleading statements and omissions artificially inflated the price of

9    AppLovin securities and operated as a fraud or deceit on the Class.  Later, when Defendants' prior

10   misrepresentations and fraudulent conduct were disclosed to the market, the price of AppLovin

11   securities fell significantly.  As a result of their purchases of AppLovin securities during the Class

12   Period, Plaintiff and the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

13                                        **COUNT I**

14   **For Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
     **Promulgated Thereunder Against All Defendants**
15

16           70.    Plaintiff repeats and realleges each and every allegation contained above as if fully set

17   forth herein.

18           71.    This Count is asserted against Defendants based upon Section 10(b) of the Exchange

19   Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

20           72.    During the Class Period, Defendants, individually and in concert, directly or indirectly,

21   disseminated or approved the false statements specified above, which they knew or deliberately

22   disregarded were misleading in that they contained misrepresentations and failed to disclose material

23   facts necessary in order to make the statements made, in light of the circumstances under which they

24   were made, not misleading.

25           73.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

26                  a.   employed devices, schemes and artifices to defraud;

27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

b.  made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.  engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

74.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

75.    Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other AppLovin personnel to members of the investing public, including Plaintiff and the Class.

76.    As a result of the foregoing, the market price of AppLovin securities was artificially inflated during the Class Period.  In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of AppLovin securities during the Class Period in purchasing AppLovin securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

77.    Had Plaintiff and the other members of the Class been aware that the market price of AppLovin securities had been artificially and falsely inflated by Defendants' misleading statements

1   and by the material adverse information which Defendants did not disclose, they would not have

2   purchased Company securities at the artificially inflated prices that they did, or at all.

3           78.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the

4   Class have suffered damages in an amount to be established at trial.

5           79.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act

6   and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the

7   Class for substantial damages which they suffered in connection with their purchase of AppLovin

8   securities during the Class Period.

9                                           **COUNT II**

10                  **Violations of Section 20(a) of The Exchange Act**
                             **Against the Individual Defendants**

11          80.     Plaintiff repeats, and realleges each and every allegation contained in the foregoing

12  paragraphs as if fully set forth herein.

13          81.     During the Class Period, the Individual Defendants participated in the operation and

14  management of the Company, and conducted and participated, directly and indirectly, in the conduct

15  of the Company's business affairs.  Because of their senior positions, they knew the adverse non-

16  public information about the Company's misstatement of revenue and profit and false financial

17  statements.

18          82.     As officers of a public business, the Individual Defendants had a duty to disseminate

19  accurate and truthful information with respect to the Company's financial condition and results of

20  operations, and to correct promptly any public statements issued by the Company which had become

21  materially false or misleading.

22          83.     Because of their positions of control and authority as senior executives and/or

23  directors, the Individual Defendants were able to, and did, control the contents of the various reports,

24  press releases and public filings which the Company disseminated in the marketplace during the Class

25  Period concerning the Company's results of operations.  Throughout the Class Period, the Individual

26  Defendants exercised their power and authority to cause the Company to engage in the wrongful acts

27  complained of herein.  The Individual Defendants therefore, were "controlling persons" of the

28

22

Company within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

84.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

a.   Declaring this action to be a proper class action, designating Plaintiff as Lead plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

b.   Awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

c.   Awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.   Awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

DATED: April 17, 2025                    Respectfully submitted,

/s/ Lucas E. Gilmore
**HAGENS BERMAN SOBOL SHAPIRO LLP**
Lucas E. Gilmore (Bar No. 250893)
715 Hearst Avenue, Suite 300
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
lucasg@hbsslaw.com

*Liaison Counsel for Plaintiff*

**LABATON KELLER SUCHAROW LLP**
Francis P. McConville (*pro hac vice* forthcoming*)*
Connor C. Boehme *(pro hac vice* forthcoming*)*

23

140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-047
fmcconville@labaton.com
cboehme@labaton.com

*Counsel for Plaintiff*

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## CERTIFICATION

I, Gerard Grysko, as Deputy Director of the Wayne County Employees' Retirement System ("Wayne County ERS"), hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of Wayne County ERS.  I have reviewed a complaint prepared against AppLovin Corporation ("AppLovin") alleging violations of the federal securities laws, generally adopt the allegations without waiving the right to alter the allegations in a consolidated and/or amended complaint, and authorize the filing of this pleading;

2.      Wayne County ERS did not purchase securities of AppLovin at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      Wayne County ERS is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary.  Wayne County ERS fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class;

4.      Wayne County ERS' transactions in AppLovin securities during the Class Period are reflected in Exhibit A, attached hereto;

5.      Wayne County ERS sought to serve and was appointed as a lead plaintiff or representative party on behalf of a class in the following class actions under the federal securities laws filed during the last three years:

*San Antonio Fire and Police Pension Fund v. Dentsply Sirona Inc.*, No. 1:22-cv-6339 (S.D.N.Y.)
*Ciarciello v. Bioventus Inc.*, No. 1:23-cv-0032 (M.D.N.C.)
*In re Sotera Health Company Securities Litigation*, No. 1:23-cv-0143 (N.D. Ohio)
*In re National Instruments Corp. Sec. Litig.*, No. 1:23-cv-10488 (S.D.N.Y.)
*McAlice v. The Estee Lauder Companies, Inc.*, No. 1:23-cv-10669 (S.D.N.Y.)

6.     Wayne County ERS sought to serve as a lead plaintiff or representative party in the following class action under the federal securities laws filed during the last three years.  The decision for lead plaintiff appointment is still pending:

*Cronin v. Merck & Co.*, No. 2:25-cv-1208 (D.N.J.)

7.     Wayne County ERS sought to serve as a lead plaintiff or representative party in the following class actions under the federal securities laws filed during the last three years and was not appointed:

*Collinsville Police Pension Board on Behalf of the Collinsville Police Pension Fund v. Discovery, Inc.*, No. 1:22-cv-8171 (S.D.N.Y.)
*In re PayPal Holdings Inc. Securities Litigation*, No. 3:22-cv-5864 (D.N.J.)
*City of Warwick Retirement System v. Catalent, Inc.*, No. 3:23-cv-1108 (D.N.J.)
*Schaeffer v. Signature Bank*, No. 1:23-cv-1921 (E.D.N.Y.)
*West Palm Beach Police Pension Fund v. Leslie's Incorporated*, No. 2:23-cv-1887 (D. Ariz.)
*Kempen International Funds v. Syneos Health, Inc.*, No. 1:23-cv-8848 (S.D.N.Y.)
*Kangas v. Illumina, Inc.*, No. 3:23-cv-2082 (S.D. Cal.)
*In re The Scotts Miracle-Gro Company Securities Litigation*, No. 2:24-cv-3132 (S.D. Ohio)

8.     Beyond its pro rata share of any recovery, Wayne County ERS will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this    17th   day of April, 2025.

*Gerard Grysko*
Deputy Director
Wayne County Employees' Retirement System

## EXHIBIT A

### TRANSACTIONS IN APPLOVIN CORPORATION SECURITIES

| Transaction Type | Security | Trade Date | Shares | Share Price | Cost/Proceeds |
|---|---|---|---|---|---|
| Purchases | Class A common stock | 02/13/25 | 200 | $459.4430 | ($91,889) |
| Purchases | Class A common stock | 02/13/25 | 100 | $471.6700 | ($47,167) |
| Purchases | Class A common stock | 02/13/25 | 80 | $502.3617 | ($40,189) |
| Purchases | Class A common stock | 02/14/25 | 360 | $494.5408 | ($178,035) |
| Sales | Class A common stock | 02/27/25 | (240) | $323.9476 | $77,747 |
| Sales | Class A common stock | 03/10/25 | (270) | $246.1975 | $66,473 |